### D. E. WILLIAMS v. THE STATE.

#### No. 2607.  Decided June 17, 1903.

**1.—Jury Commissioners—Qualifications of.**

It is not a valid objection to the qualification of jury commissioners who are to select the grand and petit juries, first, that they all live in different portions of a city containing two-thirds of the population of the county; second, that they were summoned orally and not by citation issued from the court.

**2.—Same—Petit Jurors.**

It is no objection to the qualification of a jury that the jurors all reside in the same city, where they are otherwise qualified according to law.

**3.—Continuance.**

A second application for continuance is properly overruled, even conceding that diligence is shown, where it appears that the testimony sought would be only cumulative.

**4.—Negligent Homicide.**

If defendant was attempting to shoot deceased, and in a struggle over the pistol it was discharged and deceased shot, it was not a case of negligent homicide but of murder, or manslaughter, as the facts might warrant.

**5.—Accidental Homicide.**

If defendant was not attempting to shoot deceased, and the pistol was discharged, it would simply be an accident.

Appeal from the Criminal District Court of Harris. Tried below before Hon. J. K. P. Gillespie.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

Appellant and Burnett Williams and Harold Williams were jointly charged by the indictment with the murder of A. E. Lipcsey, on the

17th day of July, 1902, by shooting him with a pistol, and by beating and striikng him with sticks and clubs. They were jointly tried, D. E. Williams, appellant, being convicted, and the two other defendants being acquitted.

The following, taken from the brief of appellant, is a substantially correct statement of the facts attendant upon the killing: On the day of the homicide appellant at about the hour of 1 o'clock was advised that the deceased had abused his little boy, who had previously been in the employ of deceased, calling him a damned little puppy or damned little unprincipled rascal, and pulled his ear and pinched his nose. This greatly annoyed and worried the father, and on his way down town he stopped at the place of business of the deceased to inquire the facts and circumstances. His two sons were with him at the time, but he told them both to go away. Appellant went to the office of Drs. Moore and Ehrenwerth, where the same minor son was employed. Dr. Moore was not in. Dr. Ehrenwerth told appellant that he was not in the office when deceased abused the boy, but that Dr. Moore was, and had told him, Ehrenwerth. The son was then called and repeated what had happened. Appellant then went into De Lipcsey's office and was advised that De Lipcsey was not there, but would return in an hour or so. Appellant then left the Moore-Burnett building and went to his own office, which was several blocks away, and the boys went in another direction. After being in his office and talking with people on the street for some time, he went back to see Dr. Moore. While he was there talking with Mr. Hanna, Dr. Moore passed, and he followed him to the Rice Hotel. Dr. Moore then told him De Lipcsey had taken the boy by the ear and abused him. Appellant asked him if he had seen him pull his ear and pinch his nose, and the doctor said, "No, my back was turned, and I did not see it, but I know it is a fact that he did abuse your boy," and further said, "I ordered him out of my office. His conduct was so abrupt and insulting and he acted so badly that I ordered him out of my office." Appellant then went back to his office and while there or on the streets, talked with Mr. Parker, deputy sheriff, and Mr. Stahl came along. Appellant explained to the latter his difficulty, and Stahl said De Lipcsey was a very dangerous man, and that he was liable to have trouble with him. Up to this time appellant was not armed. He again went to his office, and from there went and bought a pistol, probably about fifteen or twenty minutes before the trouble. He then went back to the Moore-Burnett building, and ascertained from the elevator boy that De Lipcsey had not returned. During the short time he was there he met Johnny Boyd and Mr. Ross. He had told Mr. Ross his trouble, and the latter said it was a frivolous matter, and appellant said to Ross he did not want trouble, and was not hunting trouble, but could not afford to let Dr. De Lipcsey or any other man in the world take his child by the ear and pinch his nose, unless he apologized. All he wanted was an apology; if he apologized to him it was all off, as he was not looking for trouble. After

talking with Mr. Kemp he walked to the door, at which time he first saw his son, Burnett, and told him to go away, as he did not want to get into trouble. Burnett walked away towards Fannin Street. When Williams walked out on the sidewalk, De Lipcsey drove up on the other side of the street and hitched his horse. They met on the sidewalk in front of the Moore-Burnett building.

Let us now trace the movements of De Lipcsey, as shown by the record: D. O. Sullivan was a friend of De Lipcsey, and had an office near that of the doctor. He had seen Williams and ascertained how he felt regarding De Lipcsey's treatment of the boy, and knew Williams wanted an apology. Sullivan telephoned De Lipcsey, advising him not to come to his office. When he telephoned, De Lipcsey just laughed, and said he did not think there would be any trouble, and said he was coming down. That it did not make any difference how many there were, he was coming. De Lipcsey was a very strong, powerful man. It was about 2 o'clock when he telephoned, and it was thirty to forty-five minutes before he came down. A. B. Wilson was near De Lipcsey when he was talking over the telephone, and heard him say, "It don't matter how many there are; I must come down." Wilson rode down town with De Lipcsey that day. De Lipcsey showed an excited state of mind—drove rapidly over the rough streets and crosswalks, and had trouble with people who happened to be in his way. He said nothing, and when Wilson would ask a question he would answer yes or no. The doctor's grip was in the buggy and he reached down, opened the grip, took a pistol out and put it in his right-hand hip pocket. He requested Wilson to go to his office with him to look over some papers. While driving De Lipcsey sat on the edge of the buggy seat and drove to town very rapidly, and he had a fixed, determined expression on his face and seemed to be in a frame of mind, from his looks, that Wilson had never seen before. It was such as to arouse the suspicion of Mr. Wilson, although the latter had not heard of any trouble. His actions indicated that he was expecting trouble. The horse was hitched across from the Moore-Burnett building, and they walked across the street towards that building. Wilson walked a little in advance and walked in the door of the building, saw Williams and knew him by sight.

Wilson, Boyd and Williams testify as to what occurred at the meeting. Wilson was nearby on the sidewalk; Boyd was in the building looking at an angle through a window; Williams, of course, was a participant. These witnesses differ but very slightly as to what occurred, but neither Wilson nor Boyd heard all that was said between Williams and De Lipcsey. Both said there was something said, but could not relate it. The testimony of appellant, as it bears directly on what was said and done, is undisputed, and therefore must be taken as true.

Williams said, "Is this De Lipcsey?" and De Lipcsey said yes. Appellant then said his name was Williams, and asked why he had abused his little boy and pulled his ear and pinched his nose as he did that

morning, and De Lipcsey said because he left his office. Williams then asked him if he had pulled his little boy's ear, pinched his nose and called him a damned little unprincipled puppy? And in answer he just stuck his face up in Williams' face, gritted his teeth and said, "Yes, and damn you, if you don't like it, help yourself." With this Williams reached out and caught De Lipcsey by the nose, and at the same time De Lipcsey jumped back and threw his hand on his gun. Just at that moment the boys appeared and commenced beating De Lipcsey over the head with clubs and sticks. From this on the boys and De Lipcsey continued fighting, De Lipcsey all the time moving towards the office of Mr. Ross. Williams took no further part in the fight until after the other three were in the inner office. When there Williams saw De Lipcsey trying to get his gun, and with his own gun in hand ran right in and tried to strike De Lipcsey and thus save the boys or himself. As Williams thus undertook to strike De Lipcsey, the latter grabbed hold of the same gun, and in the struggle De Lipcsey drew his gun close to his breast, and with muzzle pointing upward to him, the discharge took place, and the ball passed into De Lipcsey's neck in an upward direction, killing him.

*Coleman & Abbott,* for appellant.

*Howard Martin,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of five years.

Appellant's son was working for deceased, Dr. De Lipcsey, as office boy, and on account of some indignity offered by deceased to said boy, appellant and two other sons went to the office of deceased, and, meeting deceased, asked him why he pulled his boy's ears and nose. Some words followed between appellant and deceased; thereupon appellant's two sons began to beat deceased over the head with billiard cues, deceased retreating into an office in the building, appellant and his two sons following. Appellant, having a pistol, shot deceased, from which wound he died. The State's testimony shows that appellant had threatened violence to the person of deceased if he did not apologize for the manner in which he had treated his boy.

Appellant filed a motion to quash the venire of two hundred jurors, and also what he terms "a challenge to the array of petit jurors," on the ground that said venire did not constitute a lawful jury; and, as ground of said challenge and motion, states: (1) The statutes of this State provide that there shall be holden for the county of Harris, among other terms of this court, what is known as the March, 1903, term, and the April, 1903, term; (2) that no order was made during the March term, 1903, of this court appointing jury commissioners; (3) that, notwithstanding no order of this court was made during the March term,

1903, appointing jury commissioners, yet D. Rice, Sam McNeal and J. E. Archer undertook and pretended to act as jury commissioners, and under such pretenses, and as such, did select and draw the petit jurors now held and retained by this court for the present April term, a part of whom were summoned for each of the four weeks of said term, and from it the two hundred veniremen were selected and summoned, from which venire a jury was to be selected to try defendant; and that the State and defendant were required to select jurors on the trial of this case from said venire so selected; (4) that the persons so selected were not selected from the different portions of Harris County, but, as a matter of fact, said entire list of jurors and special venire were all selected from and are citizens of the city of Houston, and were such at the time of such selection, except one juror, who is a resident of the town of Houston Heights, a suburb of Houston; and the residence of said jurors is written five miles of the city of Houston; (5) that no persons were notified by the sheriff, constable or any other person authorized in the premises, or by this court, to meet or act as jury commisisoners; and that there is no record of this court showing that said pretended jury commissioners ever appeared before the court, received any instructions as to their duties, or that the judge designated to said person or persons pretending to act as such jury commissioners for what weeks they should select petit jurors, etc.; that when such persons so acting had selected a jury as above stated, they gave the names of said jurors to the clerk of this court, who then made the following entry on the record of this court: "This day, D. Rice, Sam McNeal and J. E. Archer were appointed on Monday, March 9, 1903, by the court jury commissioners, and that having been duly sworn, according to law, to select grand and petit jurors for the April term, 1903, of this court, and they having performed all duties required of them, and having made their report in open court, were discharged." This entry is dated March 12, 1903.

The bill of exceptions further shows that this constitutes every entry of record on the books of the court, or among its files, relative to the jury commissioners. Then the bill contains a long list of the special venire, showing that they all lived in the city of Houston, with the exception stated. Appended to this bill is the following qualification by the judge: "That the commissioners were appointed as required by law, and were assembled, sworn and instructed as required by law, and held their session by direction of the court as required by law, and duly made their report and the lists were handed to the clerk after he was sworn to receive them, as required by law. The court upon being questioned by defendant's counsel, further stated: 'No sir; there was no written process issued for said jury commissioners; they were summoned orally. Yes; they were summoned orally by the court.' All of the commissioners lived in the city of Houston, but in different portions of the city; and that two-thirds of the population of Harris County reside in the city of Houston. * * * The jury was ac-

cepted by defendant without exhausting his challenges allowed him by law."

Article 372, Code of Criminal Procedure, among other things, provides that the jury commissioners shall be intelligent citizens, freeholders and qualified jurors in the county. It further provides that they shall be residents of different portions of the county. The mere fact that the jury commissioners all reside within the city of Houston, which contains two-thirds of the qualified voters of the county, would not render them disqualified to act as jury commissioners, having other qualifications. The statute does not say how far the commissioners shall live from each other, but merely that they shall reside in different portions of the county. It seems that appellant's contention is that by the selection of jury commissioners from the city alone, this precludes any knowledge on the part of the jury commissioners of the fitness and qualification of jurors residing outside the limits of the city. If true, this would not be a valid objection to the selection of jury commissioners. Appellant, as we understand the bill, further insists that the jury commissioners were not summoned. The judge's qualification is that the commissioners were appointed as required by law and were assembled, sworn and instructed as required by law. We do not understand that it is absolutely essential to issue citation to the jury commissioners, inasmuch as they were notified in this instance and came into court. This clearly would be a waiver of any character of citation. Nor is it any valid objection to the venire because the same was selected entirely from the city of Houston. This is not a test as to the qualification of a juror, for if he is a freeholder in the State or householder in the county, and has paid his poll tax as the law requires, he is a qualified juror in the trial of the case in that county, regardless of whether he live in or out of the city. We see no error in the ruling of the court in selecting the jury commissioners, and veniremen by said jury commissioners, that authorizes a reversal. However, we desire to say that the spirit of these statutes should be complied with and, as far as practicable, the letter thereof.

Bill number 2 complains that the court erred in overruling appellant's second application for continuance on account of the absence of Wade, Weaver, Meadows and Moore. Appellant expected to prove by Wade that deceased caried a pistol, and witness had seen it on several occasions; that said witness identified the pistol found upon the floor where the homicide occurred as deceased's pistol. This fact was abundantly established by other witnesses, and would be merely cumulative. By the witness Meadows, appellant expected to prove that he talked with deceased about 12 o'clock noon of the day prior to the killing, and he told witness he had assaulted the little child of defendant, had abused him, but he had no regrets in the matter; that he expected appellant and his boys would be to see him in consequence thereof, and that he (deceased) was armed and prepared for them, one or all; that he was armed, and proposed to remain so, and that he had no retraction

to make, and would back up what he had said and done; that, if necessary, he would shoot. The record is full of evidence showing the desperate character of deceased, and that such character was known to appellant. It is abundantly established that he went armed. We think this testimony would also be cumulative. Appellant expected to prove substantially the same fact by the witness Weaver. By witness Moore he expected to prove that deceased went armed, and that the pistol found at the homicide was of the same character and size as the pistol he had seen deceased carry. All this testimony is cumulative, even conceding diligence, which we do not deem necessary to pass upon. The court did not err in overruling the application.

In motion for new trial appellant complains that the court erred in his charge on implied malice. The charge of the court follows the statute defining implied malice and has been approved by this court in numerous decisions.

Appellant insists that the court erred in not charging on the law of self-defense and justifiable homicide. There is not an element of self-defense or justifiable homicide made apparent by this record.

The fifth ground of his motion is that the court erred "in failing to charge the jury on the law relating to negligent homicide, and submit the question of negligent homicide to the jury under the facts and circumstances in evidence. Defendant claimed that the shooting was an accident, and he was entitled to have that question submitted to the jury, and their verdict thereon." There was undisputed evidence of the accident and how it occurred, and the court should have permitted the jury to pass on the sufficiency thereof. The only evidence insisted upon by appellant in brief and argument presenting the issue of negligent homicide is appellant's own testimony, in effect, that after he pulled deceased's nose, his boys struck and then followed him into the room; that he pulled his pistol, and when he got close enough to deceased, struck at him over his son Harold's shoulder. He says that he did so in order to knock deceased down and prevent deceased shooting his child or himself. "That thereupon deceased backed away and got up by the fireplace, then I struck at him with my right hand, and in the meantime deceased did not have the grip; it was six or eight feet away, and he threw up his left hand that way, and his right hand was down upon that gun, and was just pulling it down this way directly towards Williams' breast, and I reached in with my left hand for my pistol and deceased caught it above my right hand and tried to wrench it from me, and we surged and pulled around there and got the pistol down this way [indicating next to his breast] between us, and in the scuffle the pistol was fired; the gun was up in that position, right near the side of his neck, don't know which side; I must have had the gun near the muzzle, because my hand was powder-burned, and was that way two or three weeks or a month after; deceased fell about the time the shot was fired and at that time he had his gun out in his hand; I don't know why deceased did not use his gun; I do not know how my

pistol was discharged; I haven't any idea; it was all done in the scramble when he grabbed it, and when the pistol was discharged, it surprised me."

We have made, in effect, an exact copy of appellant's testimony in reference to the shooting. While it is scarcely intelligible, we understand deceased was endeavoring to take the pistol away from appellant, or was trying to prevent appellant from shooting him with the pistol. If either fact be true, then the issue of negligent homicide is not in the case; that is, if appellant was attempting to shoot deceased, it could not be negligent homicide; if he was not attempting to shoot deceased, and the pistol was accidentally discharged it would simply be an accident. If the record before us had shown that defendant struck deceased with a pistol, and the same was discharged, then the striking with the pistol might have been at least a misdemeanor; and if the discharge took place in the perpetration of a misdemeanor, the issue of negligent homicide would arise; but if he was attempting to shoot deceased, it would have been either murder or manslaughter, as the facts might warrant. The trend of the entire charge of the court is that, if appellant intentionally killed deceased or "purposely," as stated in one place, he would be guilty of either murder in the first or second degree, or manslaughter. This being true, it certainly was harmless error not to present affirmatively the issue of accidental homicide.

Appellant criticises the charge of the court in various particulars. We have carefully examined the charge, in connection with appellant's objections, and in our opinion it is not subject to the criticism urged by appellant. No reversible error appearing in this record, the judgment is affirmed.

*Affirmed.*